UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JO-ANN STORES, LLC,<br><br>　　　　　　　　Plaintiff,<br>　　v.<br><br>SOUND PROPERTIES, LLC,<br><br>　　　　　　　　Defendant. | CASE NO. C19-1831JLR<br><br>ORDER GRANTING MOTION FOR SUMMARY JUDGMENT |

## I.　　INTRODUCTION

Before the court is Plaintiff Jo-Ann Stores, LLC's ("Jo-Ann Stores" or "Tenant") motion for summary judgment. (MSJ (Dkt. # 28); Reply (Dkt. # 35).) Defendant Sound Properties, LLC ("Sound" or "Landlord") opposes the motion. (Resp. (Dkt. # 31).) The court has reviewed the motion, the submissions filed in support of and in opposition to

//

//

//

ORDER - 1

the motion, the relevant portions of the record, and the applicable law. Being fully advised,[1] the court GRANTS the motion.

## II. BACKGROUND

Jo-Ann Stores is "the nation's leading retailer of fabric and crafting supplies." (Beegle Decl. (Dkt. # 30) ¶ 3.) In 1996, it entered into a commercial lease for premises (the "Premises") at the Auburn Shopping Center in Auburn, Washington (the "Shopping Center"). (*Id.* ¶¶ 4-5, Ex. 1 ("Lease").) At that time, Jo-Ann Stores signed the lease with John V. Farrell and Leeann Farrell (collectively, the "Farrells"). (*See id.*) In 2004, the Farrells sold the Shopping Center, and ultimately, Sound bought the property on July 16, 2013. (Kirkland Decl. (Dkt. # 33) ¶¶ 4-5.) Around that time, the Shopping Center had various tenants, including a dance studio, laundry and cleaning service businesses, and a financial services business. (Pharmer Decl. (Dkt. # 32) ¶¶ 8-9, Ex. E.)

After Sound purchased the Shopping Center, it received an Estoppel Certificate from Jo-Ann Stores, certifying that to Jo-Ann Stores's knowledge, "the Landlord is not currently in default under the Lease." (*Id.* ¶ 10, Ex. E ("Estoppel Cert.") ¶ 4.) However, Jo-Ann Stores stated that it "has not inspected the Shopping Center . . . to verify the Landlord is in compliance with its obligation with respect thereto, and Tenant hereby reserves all rights regarding the same." (*Id.*) Furthermore, the certification provided that "[n]othing contained herein will . . . waive or estop any claims, defenses, rights or remedies of Tenant[] or . . . relieve the Landlord from any of its obligations under the

---

[1] Sound requests oral argument (*see* Resp. at 1), but the court finds that oral argument would not be helpful to its disposition of the motion, *see* Local Rules W.D. Wash. LCR 7(b)(4).

Lease." (*Id.* ¶ 9.) Jo-Ann Stores "acknowledge[d] that [Sound is] relying upon this Estoppel Certificate and the accuracy of the information contained herein," but reaffirmed that it "will not be liable to any party for damages of any kind whatsoever . . . resulting from any statement in this certificate." (*Id.* ¶ 12.)

Jo-Ann Stores and Sound executed a "Third Lease Modification and Extension Agreement" (the "Lease") on November 8, 2013. (Beegle Decl. ¶ 4.) Under the Lease, the fixed minimum rent was $10,080 per month for February 1, 2019, to January 31, 2021. (*Id.* ¶ 6.) The Lease also contained the following covenant of the Landlord:

> The Shopping Center shall be maintained, operated and managed as a first-class retail project in compliance with all laws, regulations and orders and shall be used and occupied only for normal retail uses customarily conducted in first-class shopping centers; and in no event shall the Shopping Center or any portion thereof be used as or for [listing prohibited uses].

(Lease § 26(a)(vii).) The parties agreed that in event of breach by Sound, Jo-Ann Stores had the right:

> (i) to terminate this Lease at any time during the period or such breach;
> (ii) to pay Substitute Rent during the period of such breach; and/or
> (iii) to refrain from making any payment of Rent during the period of such breach provided that business cannot reasonably be conducted from the Premises on a profitable basis of such breach.

(*Id.* § 26(b).) Substitute Rent was defined as $1,000 per month, invokable on a retroactive basis back to the date the breach first occurred. (*Id.* §§ 14, 38.) The Lease additionally included the following section entitled "No Waiver of Default":

> No waiver by either party of any of the . . . covenants . . . and no waiver of any legal or equitable relief or remedy shall be implied by the failure of either party to assert any rights, or to declare any forfeiture, or for any other reason, and no waiver of any of said . . . covenants . . . shall be valid unless it shall be in writing signed by both parties hereto. No waiver by either party or

> forgiveness of performance by either party in respect to one or more tenants of the Shopping Center shall constitute a waiver or forgiveness of performance in favor of Tenant, Landlord or any other tenant, nor shall the waiver or the forgiveness of performance of any one or more of the terms . . . of this Lease be claimed or pleaded by Tenant or Landlord to excuse a subsequent failure of performance of any of the . . . covenants.

(*Id.* § 31.) The Lease is governed by Washington state law. (*Id.* § 41.)

In November 2018, Sound leased space in the Shopping Center to Ideal Option, PLLC ("Ideal Option"), a "counseling-based business that helps individuals overcome addiction-related problems." (Kirkland Decl. ¶ 7; *see* Riojas Decl. (Dkt. # 29) ¶ 2, Ex. A ("Ideal Option Lease").) The lease with Ideal Option specified that Ideal Option:

> shall use the Premises solely for the purpose of conducting the business of a medical addiction treatment clinic . . . and for no other use without Landlord's consent.

(Ideal Option Lease § 5.1.) The lease further specified that Ideal Option "agrees not to use the Premises for the sale of merchandise . . . without Landlord's prior written consent." (*Id.* § 5.3.)

After Sound leased space to Ideal Option, Jo-Ann Stores notified Sound on December 4, 2018, that Sound was in breach of the Lease, which, it argued, entitled Jo-Ann Stores to pay Substitute Rent retroactive to November 1, 2018. (Beegle Decl. ¶ 7, Ex. 2; Kirkland Decl. ¶ 8.) Sound responded on December 6, 2018, acknowledging "the occupancy by Ideal Option as a retail counseling and therapy center" but "reject[ing] [Jo-Ann Stores's] assertion that representations and covenants are not being met" because Sound was "continu[ing] to maintain, operate and manage the [Shopping Center] as a first class retail project." (Kirkland Decl. ¶ 9, Ex. A at 1.) Jo-Ann Stores replied on

January 3, 2019, disagreeing "with the assertion that the addiction treatment center is a retail use that is normally found in first-class shopping centers." (Beegle Decl. ¶ 8, Ex. 3 at 1.) It declared its intent to pay Substitute Rent for so long as Ideal Option continues to operate in the Shopping Center. (*Id.*)

The parties continued to correspond over the matter. On March 20, 2019, Sound acknowledged that Ideal Option is "not presently retailing[,] as-such [sic] the Landlord is working closely with them exploring a retail use that they can implement." (Beegle Decl. ¶ 9, Ex. 4 at 1; *see also* Riojas Decl. ¶ 3, Ex. B at 14 (stating in interrogatory answer that "Ideal Option is primarily a service-based business").) Sound expressed its "intent to assist [Ideal Option] to institute retail such that there is no technical violation of [the] Lease." (*Id.*) However, although Sound "attempted to [sic] with Ideal Option to expand its services into retail, including but not limited to supplements and vitamins," there is no evidence that Ideal Option ever did so. (*See* Riojas Decl. ¶ 3, Ex. B at 14.) Reaching no resolution, Sound threatened to evict Jo-Ann Stores on April 16, 2019, due to outstanding rent of $45,158.40—the full rent minus the Substitute Rent Jo-Ann Stores had been paying. (Beegle Decl. ¶ 10, Ex. 5 at 1.)

To preserve its continued use of the space, Jo-Ann Stores paid the outstanding amount and agreed to pay the full rent moving forward, with the expectation that if a court rules in its favor, it would seek to recover the overpayments. (*Id.* ¶ 11, Ex. 6 at 1.) On April 24, 2020, Jo-Ann Stores provided Sound with a 30-day notice that it will "vacate the Premises and terminate the Lease" due to Sound's "breach of operating the [S]hopping [C]enter as a 'first-class retail project.'" (Beegle Decl. ¶ 12, Ex. 7 at 1.)

Jo-Ann Stores based its early termination on its right to terminate the Lease at any time during the period of a breach.  (*Id.*; *see* Lease § 26(b).)

Jo-Ann Stores filed suit on November 12, 2019, seeking damages and a declaratory judgment that Sound breached the Lease.  (Compl. (Dkt. # 1) ¶¶ 19-31.)  In its answer, Sound raised several affirmative defenses, including that Jo-Ann's Stores was estopped from bringing this suit; that it had waived its rights; and that the doctrine of laches barred the suit.  (Am. Ans. (Dkt. # 26) at 5.)  Sound also brought a counterclaim that Jo-Ann Stores breached the Lease through its early termination.  (*Id.* at 6-11.)

### III.  ANALYSIS

Summary judgment is appropriate if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  A fact is "material" if it might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

The moving party bears the initial burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of such a dispute in two ways:  (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving

party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a fact finder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252.

The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [nonmoving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh evidence or make credibility determinations in analyzing a motion for summary judgment because those are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 249-50. Nevertheless, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

Jo-Ann Stores moves for summary judgment on its breach of contract claim, which would necessarily dismiss Sound's breach of contract counterclaim. (MSJ at 9-18.) Sound argues that the Lease is ambiguous and thus, a genuine issue of material fact precludes summary judgment. (Resp. at 9-15.) Furthermore, Sound purports that various affirmative defenses create a genuine issue of material fact. (*Id.* at 15-18.) The court addresses Jo-Ann Stores's breach of contract claim before turning to Sound's affirmative defenses.

## A. Jo-Ann Stores's Breach of Contract Claim

When interpreting contracts such as the Lease, the court's primary objective is to "discern the parties' intent." *Supervalu Holdings, Inc. v. Barbara Morris Testamentary Tr.*, No. C09-5351BHS, 2010 WL 3947500, at *5 (W.D. Wash. Oct. 6, 2010). Washington follows the "objective manifestation theory of contracts," which instructs courts to determine the parties' intent "by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005). Courts may "impute an intention corresponding to the reasonable meaning of the words used," *Martin v. Smith*, 368 P.3d 227, 230 (Wash. 2005), and "can neither disregard contract language . . . nor revise the contract under a theory of construing it," *Wagner v. Wagner*, 621 P.2d 1279, 1283 (Wash. 1980). Generally, courts give words in a contract "their ordinary, usual, and popular meaning," which can be ascertained by reference to standard English dictionaries. *Hearst*, 115 P.3d at 267; *Supervalu Holdings*, 2010 WL 3947500, at *5. "[T]he interpretation of an unambiguous contract is a question of law." *Paradise Orchards Gen. P'ship v. Fearing*, 94 P.3d 372, 377 (Wash. Ct. App. 2004).

Washington has "recognized the difficulties associated with interpreting contracts solely on the basis of the 'plain meaning' of the words in the document" and thus adopted the "context rule," which allows courts to "examin[e] the context surrounding an instrument's execution." *Hearst*, 115 P.3d at 266. "If relevant for determining mutual intent, extrinsic evidence may include (1) the subject matter and objective of the contract, (2) all the circumstances surrounding the making of the contract, (3) the subsequent acts

and conduct of the parties, and (4) the reasonableness of respective interpretations urged by the parties." *Id.* However, extrinsic evidence cannot be used to "show an intention independent of the instrument" or to "vary, contradict or modify the written word." *Id.* at 267 (quoting *Hollis v. Garwall, Inc.*, 974 P.2d 836, 843 (Wash. 1999)) (internal quotation marks omitted).

At issue here is the meaning of the word "retail" as used in the provision that the Shopping Center "shall be used and occupied only for normal retail uses." (Lease § 26(a)(vii).) "Retail" is defined as "the sale of commodities or goods in small quantities to ultimate consumers." *Retail*, Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/retail (last visited June 2, 2021); *see also Retail*, Oxford English Dictionary, https://www.oed.com/view/Entry/164142 (last visited June 2, 2021) (defining "retail" as "action or business of selling goods in relatively small quantities for use or consumption rather than for resale"). Courts that have analyzed the term "retail" have consistently interpreted it to reference a place where merchandise or goods are sold. *See, e.g.*, *Foremost Dairies, Inc. v. Tax Comm'n*, 453 P.2d 870, 873 (Wash. 1969). To that end, courts have declined to qualify medical clinics as retail entities. *See, e.g.*, *Cutting v. Down E. Orthopedic Assocs., P.A.*, 278 F. Supp. 3d 485, 495-96 (D. Me. 2017) (concluding that "retail sale" does not include "provision of medical services"); *Schultz v. Nalle Clinic*, 444 F.2d 17, 19 (4th Cir. 1971) ("Applying terms normally attributable to the sale of merchandise to the practice of medicine seems contrary to common usage.").

Applied here, there is no dispute that Ideal Option, a clinic that offers medical treatment services for addiction, does not engage in retail because they do not sell

merchandise or commodities. (Kirkland Decl. ¶ 7; *see* Ideal Option Lease § 5.1 (defining its business as "medical addiction treatment").) Indeed, Ideal Option's lease prohibits the sale of merchandise without the Landlord's consent. (Ideal Option Lease §§ 5.1, 5.3.) Sound has acknowledged as much, conceding in March 2019 that Ideal Option was not "presently retailing" and attempting to "explor[e] a retail use that [it] can implement." (Beegle Decl. ¶ 9, Ex. 4 at 1; *see also* Riojas Decl. ¶ 3, Ex. B at 14 (admitting that "Ideal Option is primarily a service-based business").) Sound offers no evidence that any retail use was subsequently implemented. (*See generally* Resp.; Dkt.) Similar to the courts that have previously considered the applicability of retail to medical clinics, the court concludes that Ideal Option does not participate in "normal retail uses." *See, e.g.*, *Cutting*, 278 F. Supp. 3d at 495-96; *Schultz*, 444 F.2d at 19.

Sound does not dispute the definition of retail as discussed above. (*See* Resp.) Nor does Sound argue that Ideal Option is engaged in a normal retail use. (*See id.*) Instead, Sound pivots and maintains that the term "first-class retail" is ambiguous because it is uncertain and subject to more than one meaning. (*Id.* at 12-14.) In support, Sound cites *Jo-Ann Stores, Inc. v. Property Operating Company, LLC*, 880 A.2d 945 (Conn. App. Ct. 2005), in which the court found the term "first-class retail" ambiguous because there is a "reasonable basis for difference of opinion as to what was intended to be included within the term's definition." (*Id.* at 12 (citing *Jo-Ann Stores*, 880 A.2d at 953).) But the contract in that case did not have the additional language that the premises "shall be used and occupied only for normal retail uses." *See Jo-Ann Stores*, 880 A.2d at 953. The court cannot ignore that language here, which solidifies both the meaning of

"retail" and that tenants engage only in retail use as an independent requirement from "first class" use. *See Wagner*, 621 P.2d at 1283; *Bogomolov v. Lake Villas Condo.*, 127 P.3d 762, 766 (Wash. Ct. App. 2006) (preferring interpretation that "gives meaning to all provisions").

Sound additionally relies on the "context rule," arguing that Jo-Ann Stores's subsequent conduct reveals that the original contracting parties "did not intend [§] 26(vii) to prohibit all non-retail uses." (Resp. at 14-15.) Specifically, Sound points to the fact that the Shopping Center historically had "a plethora of non-retail tenants/businesses without objection from [Jo-Ann Stores]." (*Id.* at 14.) But the Washington Supreme Court has made clear that extrinsic evidence cannot "vary, contradict or modify the written word" of the contract. *Hearst*, 115 P.3d at 267. And here, Sound's proposed interpretation through the use of extrinsic evidence directly contradicts the written word of the Lease—namely that the Shopping Center "shall be used and occupied only for normal retail uses." (*See* Lease § 26(a)(vii).) Again, the court cannot, "under the guise of interpretation," "rewrite contracts the parties have deliberately made for themselves."[2] *See McCormick v. Dunn & Black, P.S.*, 167 P.3d 610, 619 (Wash. Ct. App. 2007).

Because § 26 is unambiguous that the Shopping Center be used only for retail purposes, and because there is no dispute that Ideal Option does not engage in retail,

---

[2] Sound also points to the fact that, in another case brought ten years ago against a different landlord in a different state, Jo-Ann Stores "never argues that [another tenant's] use is 'non-retail' in general," despite the lease having an identical non-retail covenant. (Resp. at 13 (citing *Jo-Ann Stores, Inc. v. Bay-Gard, LTD*, No. 11-CA-05096 (Fla. Cir. Ct. 2011).) The court places no weight on the legal strategy Jo-Ann Stores may have adopted in a different case a decade ago.

Sound breached § 26 of the Lease with Jo-Ann Stores.  Thus, Jo-Ann Stores was entitled, under § 38 of the Lease, to pay Substitute Rent on a retroactive basis back to November 1, 2018, when Sound leased space to Ideal Option.  (*See* Lease § 38; Kirkland Decl. ¶ 7.)  Furthermore, because Sound breached the Lease, Jo-Ann Stores was also entitled to terminate the Lease, thus defeating Sound's breach of contract counterclaim.  (*See* Lease § 26(b).)  Having resolved the breach of contract claim and counterclaim, the court now turns to Sound's affirmative defenses.

**B.     Sound's Affirmative Defenses**

Sound raises three affirmative defenses of estoppel, waiver, and laches.  (Resp. at 15-18.)  All of the defenses are premised on the fact that Jo-Ann Stores did not object to previous non-retail tenants and signed the Estoppel Certificate in 2013 indicating that the landlord at that time was not in default.  (*See id.*)  The court finds these defenses unavailing as a matter of law.

At the outset, the court notes that the Lease as well as the Estoppel Certificate foreclose the defenses of estoppel and waiver.  The Lease contains a nonwaiver clause that states that the failure to "assert any rights" or "to declare any forfeiture" will not imply a waiver and that no waiver shall be valid unless it is in writing signed by both parties.  (Lease § 31.)  No such writing has been produced.  (*See* Resp.)  Even if Jo-Ann Stores had waived its rights concerning the tenants in 2013, the nonwaiver clause provides that no waiver "in respect to one or more tenants . . . shall constitute a waiver or forgiveness of performance in favor of . . . any other tenant," nor "shall the waiver . . . excuse a subsequent failure of performance."  (Lease § 31.)  The Estoppel Certificate also

contains a nonwaiver provision that "[n]othing contained herein will . . . waive or estop any claims . . . of Tenant." (Estoppel Cert. ¶ 9.) Sound makes no argument as to why its estoppel and waiver defenses survive either of these nonwaiver clauses. (*See* Resp.); *see First Un. Mgmt., Inc. v. Slack*, 679 P.2d 936, 940 (Wash. Ct. App. 1984) (upholding nonwaiver clause in lease).

Even if the Lease and Estoppel Certificate did not foreclose Sound's estoppel and waiver defenses, those defenses still fail as a matter of law. Estoppel requires "(1) an admission, statement or act inconsistent with the claim afterward asserted, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement or act." *Wagner*, 621 P.2d at 1284. For "[m]ere silence" to effectuate estoppel, the silence "must have operated as a fraud, must have been intended to mislead, and itself must have actually misled." *Nickell v. Southview Homeowners Ass'n*, 271 P.3d 973, 980 (Wash. Ct. App. 2012). Although Sound points to Jo-Ann Stores's acknowledgement in the Estoppel Certificate that the Landlord is relying upon the representations within (*see* Estoppel Cert. ¶ 12), it introduces no evidence raising a genuine dispute of material fact that its specific breach—leasing space to Ideal Option—was done on the faith of the Estoppel Certificate, *see Wagner*, 621 P.2d at 1284. Nor does Sound produce any evidence that Jo-Ann Stores's failure to object to previous tenants amounted to fraud with an intent to mislead. (*See* Resp.)

The same applies to waiver. Waiver is "the intentional relinquishment of a known right" and requires that Jo-Ann Stores "intended to relinquish the right, advantage, or

benefit and [its] action must be inconsistent with any other intent." *Wagner*, 621 P.2d at 1283; *see also id.* at 1284 (requiring "unequivocal acts or conduct evincing an intent to waive"). Sound provides no evidence raising a genuine dispute of material fact regarding Jo-Ann Stores's intent to relinquish the right to assert a breach regarding the tenancy of Ideal Option—an entity that was not at the Shopping Center in 2013. (*See* Estoppel Cert.; Ideal Option Lease.) The evidence in the record suggests the opposite: a month after Ideal Option's tenancy, Jo-Ann Stores notified Sound that it had breached the Lease. (Beegle Decl. ¶ 7, Ex. 2; Kirkland Decl. ¶ 8.)

Sound's final affirmative defense of laches is equally without merit. Laches is an "extraordinary defense" that is "only appropriate . . . when a party, knowing his rights, takes no steps to enforce them and the condition of the other party has in good faith become so changed that he cannot be restored to his former state." *Brost v. L.A.N.D., Inc.*, 680 P.2d 453, 456 (Wash. Ct. App. 1984). Barring "highly unusual circumstances," the court is "generally precluded . . . from imposing a shorter period under the doctrine of laches than that of the relevant statute of limitations." *Id.* at 455-56. "Mere delay, lapse of time, and acquiescence, standing alone, do not bar a claim short of the statute of limitations." *Rutter v. Rutter's Est.*, 370 P.2d 862, 865 (Wash. 1962). Sound has not introduced any evidence of the "highly unusual circumstances" needed for this court to impose a shorter period than the six-year statute of limitations for a breach of contract claim. *See Brost*, 680 P.2d at 455-56; RCW 4.16.040(1); (*see* Resp.) Thus, there is no genuine dispute of material fact that laches does not bar Jo-Ann Stores's claim.

//

Because Sound breached the retail provision of the Lease and none of Sound's affirmative defenses are availing as a matter of law, the court grants summary judgment to Jo-Ann Stores on its breach of contract claim. The court additionally grants summary judgment to Jo-Ann Stores on Sound's breach of contract counterclaim and dismisses the counterclaim with prejudice. Jo-Ann Stores is entitled to a damages award of the overpayment plus pre- and post-judgment interest. *See Dautel v. Heritage Home Ctr., Inc.*, 948 P.2d 397, 400 (Wash. Ct. App. 1997) (allowing prejudgment interest as a matter of right when claim is liquidated). Moreover, under the Lease, Jo-Ann Stores is entitled to "all costs, expenses, and reasonable attorney's fees." (Lease § 19(d).) Thus, the court awards Jo-Ann Stores its costs and fees associated with bringing this suit.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS Jo-Ann Stores's motion for summary judgment (Dkt. # 28). The court AWARDS Jo-Ann Stores $173,872 plus pre- and post-judgment interest. The court additionally ORDERS Jo-Ann Stores to file a motion for costs and fees within 14 days of this order.

Dated this 7th day of June, 2021.

JAMES L. ROBART
United States District Judge